UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x

EMMANUEL DEPAS,

                                     Plaintiffs,

            -against-

THE CITY OF NEW YORK, DETECTIVE DUANE ATKINSON, SERGEANT JOSEPH MULLER, POLICE OFFICER ANTHONY ANDINO, and SERGEANT MICHAEL BILLOTTO,

                                     Defendants.
---------------------------------------------------------------------------x

FIRST AMENDED COMPLAINT

14 CV 3167 (JG) (VVP)

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1. This is an action to recover money damages arising out of the violation of Plaintiff's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

3. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367(a).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5. Plaintiff demands a trial by jury in this action.

## PARTIES

6. Plaintiff Emmanuel Depas ("Mr. Depas") is a resident of the County of Queens, State of New York.

7. Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

8. Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

9. The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10. At all times relevant herein, Defendant Detective Duane Atkinson ("Atkinson") was an officer, employee, and agent of Defendant The City of New York.

11. At all times relevant herein, Defendant Atkinson was acting within the scope of his employment with Defendant The City of New York.

12. At all times relevant herein, Defendant Atkinson was acting under color of state law.

13. Defendant Atkinson is sued in his individual and official capacities.

14. At all times relevant herein, Defendant Sergeant Joseph Muller ("Muller") was an officer, employee, and agent of Defendant The City of New York.

15. At all times relevant herein, Defendant Muller was acting within the scope of his employment with Defendant The City of New York.

16. At all times relevant herein, Defendant Muller was acting under color of state law.

17. Defendant Muller is sued in his individual and official capacities.

18. At all times relevant herein, Defendant Police Officer Anthony Andino ("Andino") was an officer, employee, and agent of Defendant The City of New York.

19. At all times relevant herein, Defendant Andino was acting within the scope of his employment with Defendant The City of New York.

20. At all times relevant herein, Defendant Andino was acting under color of state law.

21. Defendant Andino is sued in his individual and official capacities.

22. At all times relevant herein, Defendant Sergeant Michael Billotto ("Billotto") was an officer, employee, and agent of Defendant The City of New York.

23. At all times relevant herein, Defendant Billotto was acting within the scope of his employment with Defendant The City of New York.

24. At all times relevant herein, Defendant Billotto was acting under color of state law.

25. Defendant Billotto is sued in his individual and official capacities.

STATEMENT OF FACTS

26. On July 15, 2011, Mr. Depas and  was lawfully present at Beach 22nd Street between Cornaga Avenue and New Haven Avenue, Far Rockaway, New York ("Subject Location").

27. At the Subject Location, Mr. Depas was operating his motor vehicle lawfully with no criminality afoot.

28. The individual defendants were operating unmarked police cars near said location.

29. At that time, the individual defendants pulled Mr. Depas over, falsely claiming that Mr. Depas' brake lights were inoperable.

30. When the individual defendants approached the vehicle, they asked for Mr. Depas' permission to search the vehicle.

31. Mr. Depas informed the individual defendants that they could not search the vehicle without a search warrant.

32. The individual defendants continued to demand that Mr. Depas allow them to search his vehicle.

33. After refusing to allow the individual defendants to search his vehicle, the individual defendants stated they smelled marijuana, so they did not need Mr. Depas' permission.

34. Mr. Depas told the individual defendants that they did not smell marijuana, and that there was none on his person, or in his vehicle.

35. The individual defendants removed Mr. Depas from his vehicle and proceeded to search the vehicle for approximately twenty minutes.

36. During the searches, the individual defendants repeatedly went to and into their unmarked cars, before returning to Mr. Depas' vehicle.

37. There was no contraband or illegal items inside of the vehicle.

38. However, the individual defendants claimed to have found marijuana inside Mr. Depas' vehicle.

39. Mr. Depas told the individual defendants that there was no marijuana in his car and that anything they had was planted there.

40. This common practice at the NYPD, which involves planting evidence on a suspect to ensure that charges stick, is known as "flaking".

41. As set forth herein, this practice of "flaking" disproportionately affects African-Americans, including Mr. Depas, under engrained NYPD discriminatory policies, practices, and procedures.

42. The individual defendants arrested Mr. Depas.

43. Mr. Depas' arrest was without probable cause.

44. The individual defendants transported Mr. Depas to a police precinct.

45. The individual defendants also drove Mr. Depas' vehicle to the police precinct.

46. Once at the police precinct, the individual defendants searched Mr. Depas' again searched.

47. The individual defendants, again, found nothing, as there were no illegal items or contraband inside of Mr. Depas' vehicle.

48. Despite this, the individual defendants held Mr. Depas inside of the police precinct for four hours before issuing him a Desk Appearance Ticket.

49. The individual defendants then spoke with the Queens County District Attorneys' Office, individually and collectively lying to the Queens County District Attorney's Office that Mr. Depas and had violated New York Penal Law §§ 221.10 and 221.05, and Veh. & Traffic L. § 375B.IB.

50. Upon information and belief, during the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the Queens County District Attorney's Office, *inter alia*, the Desk Appearance Ticket, complaint reports, evidence vouchers, and field tests of the alleged marijuana.

51. Mr. Depas suffered damage as a result of Defendants' actions. Mr. Depas and was deprived of liberty, suffered emotional distress, mental anguish, fear, pain, anxiety, embarrassment, humiliation, and damage to reputation.

## FIRST CAUSE OF ACTION
*42 U.S.C. § 1983*

52.     Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

53.     Defendants, by their conduct toward Mr. Depas as alleged herein, violated Mr. Depas' rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

54.     As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

## SECOND CAUSE OF ACTION
*Unlawful Stop and Search*

55.     Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

56.     The individual defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Depas without reasonable suspicion.

57.     As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

## THIRD CAUSE OF ACTION
*False Arrest*

58.     Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

59.     The individual defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Depas without probable cause.

60. As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

## FOURTH CAUSE OF ACTION
*Denial of Substantive Due Process*

61. Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

62. The individual defendants created false evidence against Mr. Depas.

63. The individual defendants forwarded false evidence to prosecutors in the Queens County District Attorney's Office.

64. In creating false evidence against Mr. Depas, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Depas' right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

65. As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

## FIFTH CAUSE OF ACTION
*Malicious Abuse of Process*

66. Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

67. The individual defendants issued and/or caused to be issued legal process to place Mr. Depas under arrest.

68. The individual defendants arrested Mr. Depas in order to obtain collateral objectives outside the legitimate ends of the legal process, *inter alia*, to meet productivity/quota requirements set by Defendant The City of New York and obtain overtime pay.

69. The individual defendants pursued these collateral objectives after issuance of legal process by, *inter alia*, forwarding false evidence to the Queens County District Attorney's Office and continuing to participate in the prosecution of Mr. Depas.

70. The individual defendants acted with intent to do harm to Mr. Depas without excuse or justification.

71. As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

## SIXTH CAUSE OF ACTION
*Failure to Intervene*

72. Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

73. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

74. Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

75. As a direct and proximate result of this unlawful conduct, Mr. Depas sustained the damages alleged herein.

SEVENTH CAUSE OF ACTION
*Equal Protection Clause under 42 U.S.C. § 1983*

76. Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

77. The Defendants' conduct was tantamount to discrimination against Mr. Depas based on his ethnicity. This disparate treatment caused Mr. Depas to suffer serious injuries.

78. Such discrimination within the NYPD is pervasive and evident throughout many of its practices.

79. Evidence of the discriminatory culture and practices of the NYPD abound.

80. For example, the NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

81. One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings. Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime. Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

82. The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City

population. Blacks and Latinos were 6 times more likely to be stopped by police than Whites, Asians, and Native Americans combined.

83.     The NYPD has also maintained illegal stop and frisk policies, as part of a systematic discriminatory program aimed towards minorities.

84.     The New York State Attorney General's 1999 inquiry into the NYPD's stop and frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers indicated consistent and significant racial skewing.

85.     According to the report, Blacks comprised 25.6% of the City's population, yet 50.6% of all persons stopped were Black. Hispanics comprised 23.7% of the City's population yet, 33.0% of all stops were of Hispanics. By contrast, Whites made up 43.4% of the City's population, but accounted for only 12.9% of all stops. The disparities were further pronounced in precincts where the majority of the population was White. Where Blacks and Hispanics each represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of stops during any given period. The New York State Attorney General's finding was that 8 out of 9 searches did not uncover contraband.

86.     Under the NYPD's policy, if a person is stopped and questioned without official use of force (or with consent) and gives his or her name, documentation is not required. Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop and frisk searches.

87.     Many experts believe the numbers available from NYPD offices do not accurately reflect the discrimination of the NYPD's stop and frisk program. In one independent street

interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

88. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

89. The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

90. Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

91. Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

92. Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases. Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental. Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest. Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

93. Discrimination within the NYPD is so prevalent that it has spurred the enactment of Local Law 71, which allows members of the public to sue for being racially profiled as a result of the NYPD's stop and frisk program.

94. In fact, Defendant The City of New York is estopped from asserting that such discrimination and tactics do not occur. In *Floyd, et al. v. The City of New York*, 08 Civ. 1034 (SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods." *See Floyd*, Docket Entry No. 373 at p. 180.

95. The Court goes on to find that Defendant The City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant The City of New York have been deliberately indifferent to the tactics used by NYPD's members. *See id.* at p. 181.

96. As a result of the foregoing, Mr. Depas was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

### EIGHTH CAUSE OF ACTION
*Monell*

97. Mr. Depas repeats and re-alleges each and every allegation as if fully set forth herein.

98. This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Depas.

99. Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

100. Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

101. This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

102. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

103. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

104. Active officers are given promotion opportunities that are not afforded to inactive officers.

105. Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

106. The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are not.

107. Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully. There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

108. Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

109. The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

110. Defendant The City of New York is estopped from asserting that a quota/productivity policy does not exist and that this policy motivates police officers to violate the

rights of individuals. *See Bryant v. The City of New York*, 022011/2007 (Kings Cnty. Sup. Ct.) (jury finding that quota policy exists and that it contributed to constitutional rights violations).

111. Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

112. Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

113. Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

114. These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

115. Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

116. As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

117. As noted above, "flaking" is the practice by narcotics officers of planting drugs on or near targeted and innocent individuals, and then doctoring NYPD and legal paperwork to ensure that the charges stick.

118. This practice of flaking is used to ensure that quota and productivity goals are met by NYPD officers so that they may enjoy, among other things, financial and promotional opportunities within the NYPD.

119. This practice is widespread within the NYPD. So much so that, at the trial of Jason Arbeeny, an NYPD veteran convicted of flaking in order to meet quotas, Supreme Court Justice Gustin Reichbach stated, ""Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed."

120. At this same trial, Stephen Anderson, a former detective with the NYPD, testified that "flaking" is common within the NYPD, including among supervisors, detectives, and police officers.

121. Mr. Anderson further stated that members of the NYPD pursued this practice to meet quotas, reasoning that arrestees "would be out of jail tomorrow anyway."

122. Furthermore, the discriminatory pattern and practices by the NYPD, as well as the flaking, as set forth above, has furthered the quota and arrest policies of the NYPD.

123. Members of the NYPD are able to meet their quotas by preying on minorities, including Mr. Jimenez.

124. By targeting these populations with impunity, members of the NYPD meet their quotas and also obtain guaranteed overtime pay as set forth above.

125. As such, Defendant The City of New York actually rewards discriminatory and illegal by members of the NYPD behavior by providing guaranteed overtime to these officers without any oversight or limitations.

126. Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

127. Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

128. These policies, practices, and customs were the moving force behind Mr. Depas' injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Emmanuel Depas respectfully requests judgment against Defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
July 17, 2014

/s/
Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
*Attorney for Plaintiff*

305 Broadway, 14th Floor<br>
New York, NY  10007<br>
Phone & Fax: (646) 706-7481<br>
greg@moutonlawnyc.com